FILED
2025 Feb-20  AM 09:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| MARK DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  3:23-cv-00581-HNJ |
| | ) | |
| JAMES DISTEFANO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

On October 4, 2020, Lauderdale County deputies responded to a domestic disturbance at Plaintiff Mark Davis's residence. Officers obtained statements indicating a physical altercation occurred between Davis and his 18-year-old daughter, Katie. Deputies did not arrest anyone on the scene. The following day, Katie visited the Lauderdale County Sheriff's Department's domestic violence center to pursue charges against Davis. Thereafter, an investigator reviewed the case file, interviewed Katie and another witness, and obtained a warrant to arrest Davis for third-degree domestic violence. Davis spent one night in custody before his release on bond. On October 13, 2020, the State commenced criminal proceedings against Davis for third-degree domestic violence. On February 11, 2022, the State dismissed Davis's case with leave to reinstate.

Based on the afore-described events, Davis brought the present suit against Defendants James DiStefano,[1] Christina Keeton, and Danny Wesson, lodging federal and state law claims for false arrest, malicious prosecution, and conspiracy. (Doc. 1).

On July 26, 2024, Defendants James DiStefano and Christina Keeton filed a Motion for Summary Judgment. (Doc. 32). Defendant Danny Wesson filed a corresponding Motion for Summary Judgment adopting the arguments set forth in DiStefano and Keeton's Motion. (Doc. 36). Principally, Defendants claim qualified immunity and absolute state immunity shield officers DiStefano and Keeton from suit. Moreover, Defendants contend civilian Danny Wesson did not direct the officers to arrest Davis or otherwise influence them.

On July 30, 2024, Davis filed a cross-Motion for Summary Judgment. (Doc. 37). Davis argues the arrest warrant stood invalid because the criminal complaint's supporting "affidavit" did not constitute a sworn statement; evidence supporting the judicial officer's probable cause determination constituted uncorroborated hearsay; and Davis's use of force against Katie stood justified as a means of self-defense and/or parental discipline. Furthermore, Davis claims officers effectuated the arrest at the personal request of Defendant Wesson, a relative of James DiStefano.

Construing the facts in a light most favorable to Davis, the court **GRANTS** Defendants' motions in full. Consequently, the court **DENIES** Plaintiff's motion.

---

[1] Plaintiff previously misidentified Defendant as "James DiStephano."

## SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). The

> party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, the non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by

producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249. That is, the movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, but the court should deny summary judgment if reasonable jurors could "differ as to the import of the evidence." *Id.* at 250.

## BACKGROUND

In October 2020, eighteen-year-old Katie Davis (hereinafter "Katie") resided full time with her father Mark Davis (hereinafter "Davis"). (Doc. 34-16 at 5-6).[2] Davis maintained he "fully support[ed]" Katie. (Doc. 37-3 at 1).[3]

Katie spent the nights of October 2 and October 3, 2020, with her boyfriend, Landon Beard, and several members of his family—including Danny Wesson (Landon's maternal grandfather), Sandra Wesson (Landon's maternal grandmother),

---

[2] Due to her parents' divorced status, Katie recalled "always" moving "back and forth" between her mother's and father's homes. (Doc. 34-16 at 5). That said, she recounted permanently moving out of her mother's home in the summer of 2020 due to relational conflicts. (*Id.* at 5-6).

[3] Davis provided Katie with clothes, food, and gas money. (Doc. 34-3 at 12). Davis did not pay for Katie's college tuition and did not recall whether Katie was enrolled in community college classes at the time of the incident in question. (*Id.* at 34).

and Monica Beard (Landon's mother)—at the Wessons' home.  (Doc. 34-3 at 11; doc. 34-5 at 2).

Katie requested to stay at the Wessons' home on Friday night (October 2) because Davis planned to travel out of town for a photography job.  (Doc. 34-3 at 11; doc. 34-17 at 4:24-4:37; doc. 34-18 at 3).  Davis called Monica to express concern about the proposed arrangements.  (Doc. 34-3 at 20).  In response, Monica informed Davis that Katie would remain supervised.  (*Id.*).  Following the phone call, Davis gave Katie permission to spend one night with the Wesson family.  (*Id.* at 11).

Davis returned from his trip on Saturday, October 3.  (Doc. 34-3 at 11).  Via text message, he instructed Katie to return home.  (*Id.*).  Katie responded she would stay at the Wessons' home an additional night and proceed home "'first thing'" Sunday morning.  (*Id.*).

On October 4, Katie initially stated she would return at 2:00 p.m.  (*Id.* at 13).  However, she repeatedly set back her estimated time of arrival.  (*Id.*).  Davis called Monica in the afternoon and requested Katie's return.  (*Id.*).  Monica reportedly stated, "'I don't agree with all this stuff that's going on'" and "'I'll have her home by 8:00.'" (*Id.* at 13; 20).  Davis did not recall speaking to Katie on the phone because "she was hiding behind not answering the phone" and "controlling the conversation" via text message.  (*Id.* at 14).

According to Katie's recount of text exchanges on October 4, Davis ordered Katie to gather her belongings and find another place to live.  (Doc. 34-5 at 2; doc. 34-

6 at 2; doc. 34-12 and 37-8 at 0:39-0:46; doc. 34-13 at 2; doc. 34-15 at 2:13-2:17; doc. 34-16 at 2; doc. 34-17 at 4:40-5:04; doc. 34-18 at 3).[4]  Katie surmised her romantic relationship with Landon angered her father.  (Doc. 34-5 at 2).  Davis reportedly offered to leave Katie's belongings in the carport to "make it easy for [her]."  (Doc. 34-15 at 2:22-2:31; 34-16 at 2).  Katie refused Davis's offer because she "wanted to make sure [she] got everything that [she] needed."  (*Id.*).[5]

Katie and Landon arrived at Davis's home at approximately 11:00 p.m.  (Doc. 34-3 at 13; doc. 34-4 at 2; doc. 34-15 at 2:31-2:35; doc. 34-16 at 2).  Katie and Landon reportedly observed Davis peeking out of a window as they approached down the driveway in Landon's truck.  (Doc. 34-5 at 3; doc. 34-15 at 2:58-3:03; doc. 34-16 at 3).[6]  Landon remained in the truck while Katie knocked on the door.  (Doc. 34-3 at 13, 25; doc. 34-5 at 3; doc. 34-15 at 2:51-2:57; doc. 34-16 at 3).  Because Davis did not answer, Katie returned to Landon's truck to retrieve her keys and let herself in.  (Doc. 34-5 at 3; doc. 34-6 at 2; doc. 34-15 at 3:03-3:09; doc. 34-16 at 3).

---

[4] Katie admitted erasing all text messages to and from her father because "[she was] in the habit of … deleting [her] messages after [she] read them."  (Doc. 34-15 at 2:00-2:07; doc. 34-16 at 2).

[5] Davis denied making any such statements.  (*See* Doc. 34-3 at 13, 32).  That said, he later commented, "I might tell her, 'Hey, you need to go live at your mom's. You might need to go back and stay there.'"  (Doc. 34-3 at 15).

[6] Davis denied looking out the window and claimed he was already asleep when he heard a loud vehicle outside and a knock on the door.  (Doc. 34-3 at 24-25).  He maintained "[there] was a little bit of a delay before [he] even got up."  (*Id.*).

Upon entering the home, Katie identified herself (doc. 34-3 at 25), declared she had come to gather her belongings (doc. 34-3 at 13), and expressed her desire to refrain from arguing with Davis (doc. 34-5 at 3; doc. 34-6 at 2; doc. 34-15 at 3:15-3:20; doc. 34-16 at 3).

Katie walked to her bedroom and began loading her belongings into bags. (Doc. 34-5 at 3, doc. 34-12 and 37-8 at 0:46-1:18; doc. 34-13 at 2, 5; doc. 34-15 at 3:20-3:23; doc. 34-16 at 3). Davis surmised Katie resented him because she desired to live with her boyfriend. (Doc. 34-3 at 36). Davis reportedly told Katie, "'[Y]ou've got to be responsible…. [Y]ou've got this community service you've got to do.'" (*Id.*). In addition, Davis told Katie she needed to spend the night at home because she had school and a dentist appointment the next day. (Doc. 34-3 at 36; doc. 34-12 and 37-8 at 9:00-9:04; doc. 34-13 at 5). Davis observed Katie appeared "in a rage" and acted "disrespectful[ly]"—Katie allegedly told Davis she hated him, she did not like him being her dad, she didn't want to live with him, and she did not know why he called Monica to demand her return home. (Doc. 34-3 at 13, 36; doc. 34-4 at 2). Katie asked Davis to stop talking so she could gather her possessions and leave. (Doc. 34-12 and 37-8 at 9:04-9:07; doc. 34-13 at 5; doc. 34-15 at 3:29-3:39; doc. 34-16 at 3).

Davis retrieved a belt from a utility room and returned to Katie's bedroom. (Doc. 34-3 at 16-17). Davis looped the belt in his right hand (*id.* at 17, 86) and swung it at Katie several times (*id.* at 16-17; doc. 34-5 at 3). In his deposition testimony, Davis initially maintained he never struck Katie. (Doc. 34-3 at 16 ("I didn't hit her with the

8

belt.")).    Later during the deposition, however, Davis expressed uncertainty as to whether the belt made actual contact with Katie's person.  (*Id.* at 17 ("I'm not even sure that I hit her.  And I think that she even testified on the body cam, on the interview, that I didn't strike her."), 33 ("I don't believe I hit her with the belt.  That all happened so quick…"), 35 ("Did I hit her a couple of times with the belt? Possibly.  But she's jumping around.  Did I miss her? And the way her events is, possibly…."); doc. 34-4 at 2 ("I took my belt out of love and attempted to whip her.  It was [sic] hard licks or done out of anger.")).  At the scene of the altercation, Davis told a responding officer he hit Katie with the belt.  (Doc. 34-12 and 37-8 at 6:39-6:47; doc. 34-13 at 4).  Davis claimed he wielded the belt merely to grab Katie's attention.  (Doc. 34-3 at 17, 18; doc. 34-12 and 37-8 at 7:11-7:17; doc. 34-13 at 4).  When Katie backed away temporarily, Davis laid the belt down.  (Doc. 34-12 and 37-8 at 9:36-9:43; doc. 34-13 at 5).  Katie confirmed Davis did not hit her forcefully with the belt because she jumped out of the away.  (Doc. 34-5 at 3; doc. 34-15 and 37-8 at 9:36-9:43; doc. 34-16 at 5).

According to Katie, Davis swung the belt continuously.  Katie attempted to fend him off, but Davis overpowered her by pushing her against a wall with his forearm.  (Doc. 34-5 at 3; doc. 34-6 at 2)).[7]

---

[7] Davis acknowledged pinning Katie against the wall.  However, Davis allegedly did so because Katie "came at [him] with her fists" after he confiscated her keys.  (Doc. 34-12 and 37-8 at 10:55-11:22; doc. 34-13 at 6).

Davis confiscated Katie's car keys. (Doc. 34-4 at 2; 34-5 at 3; doc. 34-6 at 2; doc. 34-12 and 37-8 at 1:51-1:57, 9:11-9:18; doc. 34-13 at 2, 5; doc. 34-15 at 4:00-4:03; doc. 34-16 at 3).[8] Davis did not own the car, and it was registered in Katie's mother's name. (Doc. 34-5 at 3; doc. 34-15 at 4:21-4:24; doc. 34-16 at 3). Davis claimed he seized the keys because Katie's pupils appeared dilated, which suggested to him drug or alcohol use. (Doc. 34-3 at 23). In addition, Davis reportedly disapproved of Katie's decision to leave her car in a public park over the weekend. (*Id.* at 23- 24).

Katie called her mother to "get her to … tell [Davis] to give [her the] keys back." (Doc. 34-15 at 4:21-4:35; doc. 34-16 at 3; doc. 34-3 at 38; doc. 34-5 at 3). She instructed her mother to call Davis's phone and hung up. (*Id.*). Subsequently, Katie called Landon, who instructed her to come outside. (Doc. 34-15 at 4:35-4:50; doc. 34-16 at 3; doc. 34-17 at 6:36-6:51; doc. 34-18 at 4).

Davis stepped outside and signaled to Landon from the carport. (Doc. 34-17 at 6:56-7:13; doc. 34-18 at 4). Landon did not exit his truck. (*Id.*).

As Katie exited the home, she kicked the screen door and damaged it. (Doc. 34-3 at 18; doc 34-4 at 2; doc. 34-12 and 37-8 at 11:36-11:41; doc. 34-13 at 6). Katie carried some of her belongings to Landon's truck, and Davis called Katie's mother. (Doc. 34-

---

[8] Katie claimed Davis took her keys from her hand. (Doc. 34-5 at 3; doc. 34-12 and 37-8 at 1:49-1:54; doc. 34-13 at 2); doc. 34-15 at 4:03-4:21; doc. 34-16 at 3). By contrast, Davis stated he obtained Katie's keys from her bed. (Doc. 34-12 and 37-8 at 9:43-9:47; doc. 34-13 at 5).

4 at 2).  Davis stated Katie's mother agreed with his decision to confiscate Katie's car keys.  (Doc. 34-3 at 38; doc. 34-12 and 37-8 at 10:32-10:38; doc. 34-13 at 5).

Davis approached the truck and attempted to speak to Landon.  (Doc. 34-3 at 32 ("I said, 'Landon,' I said, 'I don't know what's going on with her.  She needs to stay here tonight.  She's got this community service she needs to do.' … I said, 'she's got responsibilities she needs to take care of.'"); doc. 34-5 at 3; doc. 34-15 at 5:04-5:13; doc. 34-16 at 3).  Landon stated he did not want to participate in the dispute.  (Doc. 34-17 at 7:44-8:08; doc. 34-18 at 4).

Katie deposited some of her belongings into Landon's truck and attempted to take an empty bag back inside to gather more items.  (Doc. 34-5 at 3).  Davis informed Katie he would not permit her to reenter the home.  (Doc. 34-3 at 15, 19, 32; doc. 34-5 at 3; doc. 34-12 and 37-8 at 1:24-1:31, 11:43-12:27; doc. 34-13 at 2, 6).

According to Katie, Davis grabbed Katie's arms as she moved back towards the home.  (Doc. 34-5 at 4; doc. 34-15 at 5:23-5:34; doc. 34-16 at 3).  As Katie attempted to open the door, Davis pushed her against the exterior wall of the home with one hand around her throat.  (Doc. 34-6 at 2; doc. 34-12 and 37-8 at 1:34-1:40; doc. 34-13 at 2, 3; doc. 34-15 at 5:50-6:01; doc. 34-16 at 4.  With his other hand, Davis held his cell phone at his side.  (Doc. 34-15 at 6:01-6:07; doc. 34-16 at 4).

Katie estimated Davis held her by her throat for approximately a minute.  (Doc. 34-15 at 6:07-6:11, 7:33-7:39; doc. 34-16 at 4).  In addition, Davis allegedly applied pressure to Katie's throat.  (*Id.*).  Katie claimed Davis grabbed her face, attempted to

11

hit her several times, and threatened to throw her to the ground. (Doc. 34-5 at 4; doc. 34-6 at 2). When Davis released his grip (doc. 34-15 at 8:27-8:33; doc. 34-16 at 5), Katie returned to Landon's truck and left the premises (doc. 34-6 at 2; doc. 34-15 at 8:33-8:38; doc. 34-16 at 5)). Katie subsequently called her mother. (Doc. 34-15 at 8:44-8:49; doc. 34-16 at 5).

Landon witnessed the afore-described quarrel from his truck. Consistent with Katie's account, Landon observed Davis grab Katie as she proceeded back to the home. (Doc. 34-17 at 8:20-9:06; doc. 34-18 at 4). Shortly thereafter, Landon watched Davis push Katie against the house's exterior wall and place one hand around her throat. (*Id.* at 5). Katie escaped from the wall and backed away as Davis attempted to slap her with open palms. (Doc. 34-18 at 5; doc. 34-12 and 37-8 at 2:28-2:30; doc. 34-13 at 3). Landon called his mother because he "was kind of scared" and did not know how best to render aid to Katie. (Doc. 34-17 at 9:21-9:42; 10:21-10:30; doc. 34-18 at 5).

Monica received the phone call from Landon in the presence of Danny and Sandra Wesson. Monica placed the call on speaker so the Wessons could hear Landon. Landon reportedly seemed panicked as he recounted the altercation between Davis and Katie. (Doc. 34-8 at 6; doc. 34-9 at 2). Monica instructed Landon to remain in his truck. (Doc. 34-8 at 7).

Davis recounts a different chronicle of the afore-described events outside of his home. According to Davis, Katie demanded her car keys a second time. (Doc. 34-4 at 2; doc. 34-12 and 37-8 at 12:26-12:43; doc. 34-13 at 6). When Davis refused to return

them, Katie attacked Davis with her fists. (*Id.*). Davis grabbed Katie's hands. (Doc. 34-3 at 19; doc. 34-4 at 2; doc. 34-12 and 37-8 at 12:46-12:50; doc. 34-13 at 6).[9] Although Katie calmed down temporarily, she resumed swinging her fists. (doc. 34-4 at 2; 34-12 and 37-8 at 12:58-13:04; doc. 34-13 at 6). In alleged self-defense, Davis pushed Katie against the exterior wall of the home and held his hand at the top of her chest near her neck. (Doc. 34-3 at 19, 76 (photograph of Davis demonstrating hand placement on bodycam footage), 86-87 (photographs of Davis demonstrating hand placement during deposition testimony); doc. 34-4 at 2; doc. 34-12 and 37-8 at 13:04-13:15; doc. 34-13 at 6; doc. 34-14 at 2 (photograph of Davis demonstrating hand placement on bodycam footage)).[10] Davis asserted he released Katie almost immediately. (Doc. 34-3 at 38). Katie cried, stated she wanted to call her mother, and left the premises with Landon. (Doc. 34-3 at 19, 38; doc. 34-4 at 2).

Davis retrieved his cell phone and resumed talking to Katie's mother. (Doc. 34-4 at 2; doc. 34-12 and 37-8 at 13:39-13:46; doc. 34-13 at 7).[11] He then hung up and dialed Monica. (Doc. 34-4 at 2; doc. 34-12 and 37-8 at 13:50-13:55; doc. 34-13 at 7). Monica allegedly accused Davis of harming Katie. (Doc. 34-3 at 20).[12]

---

[9] In his deposition, Davis stated he grabbed Katie's arms rather than her hands. (Doc. 34-3 at 10).

[10] Davis denied holding Katie by her throat. (Doc. 34-3 at 33, 38). In addition, Davis stated he pushed Katie two feet at most (doc. 34-3 at 19) and used minimal force (doc. 34-3 at 27).

[11] Katie did not know to whom Davis spoke. (Doc. 34-16 at 5).

[12] According to Davis, Monica stated, "'you bastard, I know what you did to Katie and I know where you live. My daddy would never do anything like that to me.'" (Doc. 34-4 at 2).

Davis telephoned for law enforcement.   (Doc. 34-3 at 20; doc. 34-4 at 2).[13]
Deputy Jason Brown arrived approximately 5 to 6 minutes thereafter.   (Doc. 34-3 at
20).[14]

A few minutes later, Monica and Danny arrived on the premises.   Davis
estimated less than 10 minutes elapsed between Landon and Katie leaving and Monica
and Danny arriving.  (Doc. 34-3 at 22).  Davis recalled Danny pulling into the driveway
at such a high speed that his vehicle almost struck Deputy Brown's vehicle.  (Doc. 34-
3 at 20; doc. 34-4 at 2).  Danny and Monica allegedly screamed threatening words at
Davis.  (Doc. 34-3 at 21; doc. 34-4 at 2).[15]

Deputy Brown instructed Danny to park his vehicle on the road.  (Doc. 34-8 at
9, 12; doc. 34-9 at 2).

Davis prepared a typed statement inside his home.  (Doc. 34-4; doc. 34-12 and
37-8 at 6:18-6:28; doc. 34-13 at 4).  While completing the statement, Landon allegedly
called Davis several times.  Davis answered one of the calls, at which point Landon
yelled, "M'F' don't ever lay hands on Katie again.  I'll whoop your ass." (Doc. 34-4 at

---

[13] Monica also called law enforcement.  (Doc. 34-9 at 2).

[14] Investigator Keeton speculated Davis called law enforcement because of a voicemail Davis received
from Landon.  (Doc. 34-1 at 9 ("I believe earlier [Davis] stated he called [9-1-1] after [Katie and
Landon] left because of a voicemail.")).  However, Davis's written statement suggests he received a
voicemail from Landon after deputies had already arrived on the premises.  (See doc. 34-4 at 2 ("While
writing this report Landon called my phone several times…. He left a threatening message.")).

[15] Later in the evening, Deputy Brown allegedly told Davis that Danny had a nine-millimeter gun on
the console of his truck.  (Doc. 34-3 at 21; doc. 34-4 at 2).   Davis expressed a belief Danny would
have shot and killed him if officers were not present.  (Doc. 34-3 at 21).

2).  Later, Landon reportedly left a threatening voicemail on Davis's phone, which

stated:

> How about you f***** call me back you m***** f*****, I'm fixing to f***
> your ass up I don't care who you think you are, if you ever lay a hand on
> Katie I come and beast the f*** out of you you f****** dumb ass.  So will
> my grandfather.  I don't give a f*** where you came from city slicker.  You
> have no f****** clue who you are dealing with.  I'll f*** you up.  M*****
> f*****, I don't care who you are.

(Doc. 34-4 at 2).

Monica and Danny retrieved Katie and Landon and returned to Davis's home.

(Doc. 34-5 at 4).  Davis estimated 15 to 20 minutes elapsed between Monica and

Danny's initial arrival and Katie and Landon's return.  (Doc. 34-3 at 31).

Deputy Brown, with the assistance of Deputy David Alfaro, separately

interviewed Katie and Davis.  (Doc. 34-10 at 6-7).

Katie provided her account of the afore-described events and prepared a written

statement of the same.  (Doc. 34-12 and 37-8 at 0:30-3:14, 4:45-4:58; doc. 34-13 at 2-3;

doc. 34-6 at 2).  Officers conducted a physical examination of Katie, who sat in the

back seat of Danny's car in dim lighting.  (Doc. 34-12 and 37-8 at 3:14-3:35; doc. 34-13

at 3).  Officers did not observe any marks on Katie's person (doc. 24-12 and 37-8 at

16:15-16:23; doc. 34-13 at 8), but they remarked Katie's shirt collar appeared minimally

stretched (doc. 34-12 and 37-8 at 16:25-16:32, 19:13-19:16; doc. 34-13 at 8,11).[16]  In

---

[16] On the scene of the investigation, the deputies recalled Katie informing them Davis struck her with
the belt "extremely hard" on the leg.  (Doc. 34-13 at 8).  On this point, law enforcement remarked
Katie did not have any marks on her legs indicating Davis struck her with a belt.  (*See Id.* at 11).

addition, Katie spoke with a hoarse voice.  (Doc. 34-12 and 37-8 at 0:30-3:14; *see also* doc. 34-1 at 10; doc. 34-3 at 32; doc. 34-9 at 2).

After interviewing Katie, the deputies interviewed Davis.  (Doc. 34-12 and 37-8 at 6:29-13:57; doc. 34-13 at 4-8).  The deputies observed a scratch on Davis's arm and damage to the home's screen door.  (Doc. 34-12 and 37-8 at 6:53, 11:39, 16:00-16:04; doc. 34-13 at 8).  When asked about the source of the scratch, Davis explained, "Probably from her.  I didn't even know that was there. I take Metformin for diabetes and my skin's real thin, but, you know, I—listen, that could have come from her, but I got a dog. Me and the dog play. It could have come from the dog."  (Doc. 34-12 and 37-8 at 6:54-7:09; doc. 34-13 at 4; *see also* doc. 34-3 at 36).

The deputies returned to Danny's vehicle to speak to Danny, Monica, Landon, and Katie.  Deputy Brown explained he would not arrest Davis that night given the absence of marks on Katie's body.  (Doc. 34-12 and 37-8 at 18:44-19:59; doc. 34-13 at 9-10; *see also* doc. 34-12 and 37-8 at 33:51-34:21; doc. 34-13 at 16).  Danny, Monica, and Landon expressed disagreement with the deputies' decision to refrain from arresting Davis.  (Doc. 34-12 and 37-8 at 19:58-20:20; doc. 34-13 at 10).  Danny suggested Davis created the marks on his body and damaged the door himself.  (Doc. 34-12 and 37-8 at 20:50-20:53; doc. 34-13 at 10; doc. 34-12 and 37-8 at 34:21-34:26; doc. 34-13 at 16).  In

---

However, the bodycam footage indicates Katie actually remarked, "[Davis] started *trying to hit me* with [the belt]."  (*Id.* at 2 (emphasis added)).  Shortly thereafter, Katie stated, "[Davis] put his hand on my throat and was *holding me so hard*."  (*Id.* at 3 (emphasis added)).  Law enforcement may have confounded these two statements when discussing Katie's initial interview and physical examination.

addition, he referred to the guns he owned (doc. 34-12 and 37-8 at 23:02-23:06; doc. 34-13 at 11, 12) and expressed support for the police generally (doc. 34-12 and 37-8 at 24:18-24:34; doc. 34-13 at 12).

Deputy Brown explained Katie could go to One Place of the Shoals Family Justice Center to bring charges against her father if she wished to do so. (Doc. 34-12 and 37-8 at 26:20-27:50; doc. 34-13 at 13). Deputy Brown stated deputies Christina Keeton and James DiStefano handled domestic violence investigations at One Place. (Doc. 34-12 and 37-8 at 28:30-28:50; doc. 34-13 at 14).

Monica informed the officers of a familial relation with James DiStefano and asked whether the association would affect the case. (Doc. 34-12 and 37-8 at 35:06-35:14; doc. 34-13 at 16). Deputy Brown responded in the negative. (*Id.*). Danny and Monica claimed DiStefano lived nearby and typically attended holiday gatherings. (Doc. 34-12 and 37-8 at 35:14-35:40; doc. 34-13 at 17). Deputy Brown responded, "But Christina is—works with James, and she's really good." (*Id.*).

Deputy Brown returned Katie's car keys. (Doc. 34-12 and 37-8 at 27:48-27:55; doc. 34-13 at 14). Katie retrieved additional items from Davis's home and departed with Monica. (Doc. 34-10 at 7).

According to an undated statement signed by Danny Wesson, Sandra Wesson examined Katie's neck later in the evening. (Doc. 34-9 at 2). Sandra observed "[Katie's] neck was red and Katie was very hoarse, indicative of being choked." (*Id.*).

On Monday, October 5, 2020, James DiStefano reviewed the police report detailing the October 4 altercation between Davis and Katie. (*See* Doc. 34-2 at 3). Distefano "noticed Landon Beard's name in [the report], which [he] knew to be [his] wife's cousin." (*Id.*). Accordingly, DiStefano assigned the case to Christina Keeton. (*Id.*).[17]

Keeton reviewed the case file, including bodycam footage, on that same October 5, Monday morning. (Doc. 34-1 at 5). When Katie, Landon, and Monica arrived at One Place, DiStefano instructed Keeton to greet them. (*Id.*). Keeton recorded separate interviews of Katie and Landon and prepared a supplemental narrative of the interviews. (Doc. 34-10 at 11; doc. 34-15; doc. 34-16; doc. 34-17; doc. 34-18).[18] In addition, Keeton stated Katie received a strangulation test, but she did not recall the results. (Doc. 34-1 at 13).

On Tuesday, October 6, Keeton filed a sworn criminal complaint against Davis in the District Court of Lauderdale County, Alabama, indicating probable cause existed

---

[17] Christina Keeton served as an investigator with the Special Victims Unit at One Place of the Shoals. (Doc. 34-1 at 4). James DiStefano served as a corporal with the Special Victims Unit at One Place of the Shoals. (Doc. 34-2 at 3).

[18] During the interview, Keeton asked Katie whether Davis had ever displayed violence towards her previously. Katie responded, "[O]ne time he did get mad and he flipped a table, and he wouldn't, like—I was trying to get—I just—when I stayed with my mom, I just brought a backpack with clothes to his house, and I was trying to get all that together to leave, and I was in the bathroom and he, like, stood in the doorway and, like, wouldn't let me leave. And then eventually I got into the living room, and he wouldn't let me leave, and then I was going to the door, and he stood in front of the door for the longest time trying to tell me to stay, and I was like I'm just going to my mom's house, and, like, he wouldn't let me leave to do that." (Doc. 34-15 at 10:33-11:08; doc. 34-16 at 6).

to believe Davis violated Alabama Code § 13A-6-132 (third-degree domestic violence). (Doc. 37-0 at 5). The executed criminal complaint includes signatures from Keeton and a judicial officer. (*Id.*). Under the section requesting "specific facts," Keeton provided, "See attached officer's affidavit incorporated by reference." (*Id.*). Keeton confirmed she attached the police report to the criminal complaint. (*See* doc. 34-1 at 12 ("In those days you had to walk over to the clerks and do it all face-to-face…. [T]he affidavit was the report, which was what we did with every case then.")). The police report itself did not appear sworn, signed, or notarized. Based upon the information contained in the criminal complaint and the attached police report, the magistrate judge issued a warrant of arrest. (Doc. 37-9 at 6).[19]

Katie testified DiStefano took photographs of a series of bruises on her arms approximately an hour before Davis's arrest on October 7, 2020. (Doc. 34-3 at 44). The photographs depict Katie standing in the kitchen of the Wessons' home. (Doc. 34-11 at 2-8). DiStefano did not recall whether he took photographs of Katie's arms. (Doc. 34-2 at 4). Nor did he recall whether Keeton took possession of the photographs

---

[19] In her deposition, Keeton testified the following circumstances evinced probable cause to arrest Davis on a third-degree domestic violence charge: "the fact that [Katie's] throat was so hoarse that night, the fact that she told the deputies that [Davis] grabbed her by the neck and pinned her against the wall, the fact that she comes in, and I interview her separately from Landon, and she advises me of the same consistent series of events during this domestic violence incident, and the bruises [on Katie's person]." In addition, Keeton reviewed Davis's statements on the bodycam footage and determined Davis "swung the belt at [Katie] multiple times before she ever raised a hand at him." (Doc. 34-1 at 10-11; see also id. at 17 ("I watched the body camera. I read [Davis's] statement. I observed him give a statement on body camera and admit that he retrieved the belt from another room, and he actually stated that he did hit her twice, and that was before he ever said that she was in any type of way aggressive or anything towards him.")).

before she filed a criminal complaint with the judicial officer. (*Id.* at 9).[20] Keeton received the photographs via email. (Doc. 34-1 at 6).

On October 7, DiStefano, Deputy Brown, and Investigator Cason arrived at Davis's home and placed him under arrest. (Doc. 34-2 at 4). Davis spent a night in custody before the court released him on bond. (Doc. 1 at 7).

On October 9, 2020, Davis located a "close fist bruise" on his chest. (Doc. 37-3 at 10).

On October 13, 2020, the State commenced criminal proceedings against Davis for third-degree domestic violence. (Doc. 37-9 at 1). On February 3, 2022, Davis moved to dismiss the charge "on the basis of defects in the Complaint and Warrant," arguing such documents did not include an attached affidavit. (*See* doc. 37-9 at 16). Furthermore, Davis claimed his use of force against his daughter stood justified, citing Alabama Code § 13A-3-23 (self-defense) and 13A-3-24 (discipline of a minor child). (*Id.* at 17). The court denied the motion. (Id. at 1). On February 4, 2022, Davis filed a motion "to reconsider the order finding the motion to dismiss the charge … on the basis of substantive defects in the Complaint and Warrant moot." (*Id.* at 20). The court denied that motion, as well. (*Id.* at 1).

---

[20] Davis claimed he noticed deep purple bruises on Katie's arms approximately 10 days before the altercation. (Doc. 34-3 at 42). In addition, Davis claimed he grabbed Katie's arms near her wrists, not her upper arms. (*Id.*). Accordingly, he maintained he did not create the bruises.

In his interview with Keeton, Landon remarked Katie sustained a bruise on her back from possible contact with a pole attached to the exterior of Davis's home. (Doc. 34-17 at 9:48-9:52; doc. 34-18 at 5).

On February 7, 2022, Austin Burdick (defense counsel) and Will Gieski (Lauderdale County Assistant District Attorney) discussed defense counsel's "plan to file a Mandamus petition with the State Supreme Court on the defective warrant and immunity issue…." (Doc. 37-4 at 4). On February 9, Gieski offered to dismiss the case in exchange for an order stating Davis should have no contact with Katie. (*Id.*). Burdick reportedly expressed disagreement with the no-contact terms. (*Id.* at 5).

On February 11, 2022, the court entered an order expressing as follows: "Upon oral motion of the State, this case is hereby Nolle Prossed with leave to reinstate. Defendant to have No Contact with Katie Davis." (Doc. 37-9 at 24). Later that day, the court amended the order to remove the no-contact terms. (*Id.* at 25).[21]

Davis sued Defendants on May 5, 2023, alleging false arrest, malicious prosecution, and conspiracy claims under both federal and state law. (Doc. 1).[22]

---

[21] Davis believed the State dismissed the case due to defects in the criminal complaint and warrant. (Doc. 34-3 at 30).

[22] On June 20, 2023, Katie Davis sent DiStefano the following message via email:

> Hey! I don't know if you remember me or not, but im Landons ex girlfriend. Gracie told me about my dad suing her poppy, you and your partner christina, i think thats all right. but i just wanted to tell yall im so sorry for him dragging yall back into this mess. i dont know why in the world two years later he has done this, its embarrassing for me because i know all of yall and if it wasnt for me none of yall wouldve been drug into this. its been heavy on my mind all day since I found out about it and I just wanted to let yall know even though i cant help it that i really am sorry.

> Even though me and Landon didnt work out I will always be grateful for his family and you guys for all yall did for me during that time of my life. I just hate he's done this. Again, im sorry for his actions and I hope everything goes in all of yalls favor.

(Doc. 34-7 at 2).

On July 26, 2024, Defendants DiStefano and Keeton filed a motion for summary judgment. (Doc. 32). On July 30, 2024, Davis filed a cross-motion for summary judgment. (Doc. 37).

## ANALYSIS

## I.    FEDERAL LAW CLAIMS

The Fourth Amendment, applicable to the States through the Fourteenth Amendment, guarantees a person's right against unreasonable searches and seizures. U.S. Const. amend. IV, XIV. Relevant here, the Fourth Amendment provides, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." Violations of this provision may support a false arrest or malicious prosecution claim under 42 U.S.C. § 1983. *See Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) ("An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a § 1983 claim[.]"); *Wood v. Kessler*, 323 F.3d 872, 882 (11th Cir. 2003) ("Our Court has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983.").

As an initial matter, Defendants maintain Davis does not adequately allege a violation of § 1983 because the Complaint fails to explicitly reference a violation of a constitutional provision. (Doc. 33 at 16); *see Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979) (noting § 1983 constitutes "a method for vindicating federal rights elsewhere conferred" and cannot independently confer substantive rights). The court disagrees.

Davis's Complaint provides sufficient notice of alleged Fourth Amendment violations underpinning his § 1983 claims.

Although Federal Rule of Civil Procedure 8 requires pleading of a plausible claim, it does not require a highly technical denomination of causes of actions:

> Rule 8 provides that to state a claim for relief, a pleading must contain the following: (1) "a short and plain statement of the grounds for the court's jurisdiction[;]" (2) "a short and plain statement of the claim showing the pleader is entitled to relief;" and (3) "a demand for the relief sought." Fed. R. Civ. P. 8(a). The short and plain statement of the claim "need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (alteration omitted). Rule 8 also makes clear that "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). *See also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-14 (2002) (explaining that "[t]he liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of the claim").
>
> Moreover, the "Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48 (1957), *abrogated in part by Twombly*, 550 U.S. at 563; *Harris v. Garner*, 216 F.3d 970, 996 (11th Cir. 2000) (same). See also 6-107 Collier Bankruptcy Practice Guide P. 107.03 ("[Rule] 8(e) provides that 'pleadings must be construed so as to do justice.' This rule is at the very heart of the rules regarding pleadings. 'Pleadings are intended to serve as a means of arriving at fair and just settlements of controversies between litigants. They should not raise barriers which prevent the achievement of that end.'") (quoting *Maty v. Grasselli Chem. Co.*, 303 U.S. 197, 200 (1938)); *De Loach v. Crowley's Inc.*, 128 F.2d 378, 380 (5th Cir. 1942). ("Just what [Rule 8(e)] means is not clear, but it excludes requiring technical exactness, or the making of refined inferences against the pleader, and requires an effort fairly to understand what he attempts to set forth.").

*Beem v. Ferguson*, 713 F. App'x 974, 979 (11th Cir. 2018) (alterations in original) (footnotes omitted); *see also* 2 MOORE'S FEDERAL PRACTICE - CIVIL § 8.10 (2020) ("[P]leadings should not be dismissed for technical defects. The pleading should be construed as a whole, to determine whether adequate notice of the claim or defense is presented.").[23]

---

[23] Citing, *inter alia*, *Reiter v. Cooper*, 507 U.S. 258, 263, (1993) (counterclaims mistakenly designated as defenses considered because Fed. R. Civ. P. 8(e) requires court to construe pleadings as justice requires); *Arar v. Ashcroft*, 585 F.3d 559, 595 n.19 (2d Cir. 2009) (objective of Fed. R. Civ. P. 8(e) is to ensure that actions are determined on their merits and according to the dictates of justice, rather than in terms of whether pleadings are artfully drawn); *Miller v. Phila. Geriatric Ctr.*, 463 F.3d 266, 271–72 (3d Cir. 2006) (because pleadings must be construed to do justice, pleadings need not be construed against pleader, but court should make determined effort to understand what pleader is attempting to set forth); *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 418-419 (4th Cir. 2014) (complaint alleging bystander liability was not insufficient merely because words "bystander liability" did not appear anywhere in complaint; pleaders are not required to use any "precise or magical words" in their pleadings—rather, courts must look to substance of allegations); *Garrett v. Judson Indep. Sch. Dist.*, 299 F. App'x 337, 346 (5th Cir. 2008) (pleadings must be construed to do justice; courts do not require technical forms of pleading or motions; it is enough that plaintiff pleaded sufficient facts to put defense on notice of theories on which complaint is based); *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 895 n. 3 (6th Cir. 2019) (court's function is to construe complaint to do justice; in doing so it must consider entire complaint to determine if plaintiff has stated plausible claim, including matter alleged in other counts and not incorporated by reference); *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 570 (6th Cir. 2013) (district court properly construed complaint so as to do justice, by examining substance of complaint rather than labels); *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010) ("One objective of Rule 8 is to decide cases fairly on their merits, not to debate finer points of pleading where opponents have fair notice of the claim or defense."); *Kimes v. Stone*, 84 F.3d 1121, 1129 (9th Cir. 1996) (substantial justice in civil rights action means complaint sufficient if fair notice given of claim and ground upon which it rests); *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1107-1108 (10th Cir. 2009) (in order to do justice, court must not rely solely on labels in complaint, but must probe deeper and examine substance); *Beem v. Ferguson,* 713 F. App'x 974, 979 (11th Cir. 2018) (pleadings must be construed so as to do justice; federal rules reject approach that pleading is game of skill in which one misstep by counsel may be decisive to outcome and accept principle that purpose of pleading is to facilitate proper decision on merits; Fed. R. Civ. P. 8(e) excludes requiring technical exactness, or making of refined inferences against pleader, and requires fair effort to understand what pleader attempts to set forth); *Varnes v. Local 91, Glass Bottle Blowers*, 674 F.2d 1365, 1371 (11th Cir. 1982) (relief from default judgment required by substantial justice under both Fed. R. Civ. P. 8(e) and Fed. R. Civ. P. 1).

In line with the foregoing authorities, the undersigned must examine the substance of Davis's Complaint rather than the labels affixed to each count. Although Davis does not explicitly reference the Fourth Amendment, he alleges Defendants arrested him without probable cause and issued an invalid arrest warrant. (Doc. 1). Indeed, the substantive elements of federal false arrest and malicious prosecution claims clearly derive from the Fourth Amendment. *See Eiras v. Florida*, 239 F.Supp.3d 1331, 1338 (M.D. Fla. 2017) ("The Eleventh Circuit has 'identified a [warrantless arrest without probable cause] as a violation of the Fourth Amendment and a viable claim under [Section] 1983.'" (quoting *Jones v. Brown*, 649 Fed. App'x 889, 890 (11th Cir. 2016)); *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022) (noting plaintiff must prove "the *defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process*" and "the criminal proceedings against him terminated in his favor" to succeed on a malicious prosecution claim) (emphasis added) (citing *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020)). Indeed, courts frequently denominate certain claims for unlawful seizure under the Fourth Amendment as "false arrest" and/or "malicious prosecution." *See, e.g., Williams v. Aguire*, 965 F.3d 1147, 1157 (11th Cir. 2020) ("[T]his Court uses 'malicious prosecution' as only 'a shorthand way of describing' certain claims of unlawful seizure under the Fourth Amendment") (quoting *Whiting v. Traylor*, 85 F.3d 581, 584 (11th Cir. 1996), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384, 389-90 (2007)). Construing the Complaint liberally, then, Davis put Defendants on adequate notice of Fourth Amendment violations underlying his § 1983 claims.

**A. The Court Dismisses Count I Because the Arrest in Question Occurred Pursuant to Legal Process.**

As recounted previously, Davis argues Defendants DiStefano and Keeton falsely arrested him for third-degree domestic violence without probable cause pursuant to a warrant lacking a "written affidavit or any other sworn statement" and "at the urging and behest of a personal friend with a vendetta against [him]." (Doc. 1 at 7-8).[24]

Although Davis may challenge the constitutional validity of the arrest warrant, "a false arrest claim is not the appropriate cause of action for him to do so given that his arrest was pursuant to legal process." *Grider v. City of Auburn, Ala.,* No. 3:23-cv-287-RAH, 2024 WL 1223459, at *8 (M.D. Ala. March 21, 2024). Indeed, "[t]he issuance of a warrant—*even an invalid one as [Davis] alleges was issued here*—constitutes legal process, and thus, where an individual has been arrested pursuant to a warrant, his claim is for malicious prosecution rather than false arrest." *Carter v. Gore*, 557 F. App'x 904, 906 (11th Cir. 2014) (*per curiam*) (emphasis added); *see also Williams v. Aguire,* 965 F.3d 1147, 1158 (11th Cir. 2020) ("A claim of false arrest or imprisonment under the Fourth Amendment concerns seizures without legal process, such as warrantless arrests. These claims accrue when either the seizure ends or the plaintiff is held pursuant to legal

---

[24] The undersigned construes the Complaint to lodge false arrest, malicious prosecution, and conspiracy claims against Defendants in their individual capacities, as such claims sound in tort. Davis may not seek retrospective relief from Defendants for official-capacity actions, as the Eleventh Amendment bars damages actions against a State in federal court absent waiver or congressional override. *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (rejecting plaintiff's effort to obtain monetary relief from the state for past-withheld benefits even though the plaintiff named only a state official and not the state as a defendant).

process.   Malicious prosecution, in contrast, requires a seizure pursuant to legal process." (citations and quotations omitted)); *Bender v. Zezulka*, 2:14-CV-1583-KOB, 2015 WL 4506683, at *2 (N.D. Ala. July 23, 2015) ("Because [Plaintiff's] claim against [Defendant] is based on the issuance of a warrant, his claim against [Defendant] is for malicious prosecution not false arrest. Therefore, [Defendant] is entitled to judgment on [Plaintiff's] false arrest claim."); *Spillers v. Crawford Cnty.*, No. 5:11-CV-324, 2011 WL 5910738, at *7 (M.D. Ga. Nov. 28, 2011) ("When a Fourth Amendment claim is based on a seizure that involves an arrest warrant or is otherwise pursuant to legal process, the claim should be analyzed as a section 1983 malicious prosecution claim rather than a section 1983 false arrest claim."); *Wallace v. Kato*, 549 U.S. 384, 390 (2007) ("If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more.   From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself." (citation and quotations omitted)).   Accordingly, the court **DISMISSES** Count I of the Complaint because a false arrest claim may not hinge upon the issuance of a warrant.

## B. The Court Dismisses Count III Because (1) Probable Cause Justified Issuance of the Arrest Warrant and (2) Defendants Rendered No Intentional Omissions or Misstatements in Support of the Warrant.

Davis pursues a malicious prosecution claim against all Defendants.   Specifically, Davis alleges "Defendants [DiStefano] and Keeton arrested Plaintiff without probable cause to believe that he had committed a crime, providing supporting statements for

the warrant and to the prosecutors involved." (Doc. 1 at 9). In addition, DiStefano and Keeton allegedly held Davis in custody and "kept the case against [Davis] in the legal system as long as they could" at the urging and behest of Defendant Wesson. (*Id.*). Although the State eventually *nol prossed* his case, Davis alleges "[he] had to spend a significant amount of money defending himself against the charges and receiving counseling and therapy following these events," and "incurred other financial, emotional, and mental damages." (*Id.*).

The court dismisses Davis's malicious prosecution claim against all Defendants because no constitutional violation occurred. More specifically, probable cause justified the issuance and execution of the arrest warrant and Defendants did not intentionally render misstatements or omissions in support of the warrant.[25]

---

[25] As the court will explain in more detail, the presence of probable cause entitles Defendants DiStefano and Keeton—state officials engaged in discretionary functions—to qualified immunity.

Although the court's analysis regarding Defendant Wesson diverges slightly, dismissal still hinges on the absence of probable cause. Davis alleges Wesson, *a private citizen*, conspired with DiStefano and Keeton to secure the arrest warrant and prosecute Davis. Because § 1983 provides a private right of action against those acting under color of state law, "the deprivation must be made by a state actor." *Charles v. Johnson*, 18 F.4th 686, 693-94 (11th Cir. 2021) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)); *see also Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1276 n. 4 (11th Cir. 2003) ("Although § 1983 technically requires that the action in question be taken 'under color of [state] law,' this requirement is considered *in pari materia* with the Fourteenth Amendment's state action requirement.").

In the following situations, courts may deem private entities state actors:

> (1) The State has coerced or at least significantly encouraged the action alleged to violate the Constitution ("State compulsion test"); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ("public function test"); or (3) the State had so far insinuated itself into a position of interdependence with the private parties that it was a joint participant in the enterprise ("nexus/joint action test").

Qualified immunity shields government officials engaged in discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

*Charles*, 18 F.4th at 694 (quoting *Rayburn ex rel. v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001)) (citing *Lugar*, 457 U.S. at 939); *see also Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288, 296 (2001) (A "challenged activity may be state action when it results from the State's exercise of 'coercive power,' . . . when the State provides 'significant encouragement, either overt or covert,' . . . or when a private actor operates as a 'willful participant in joint activity with the State or its agents.' . . . We have treated a nominally private entity as a state actor when it is controlled by an 'agency of the State,' . . . when it has been delegated a public function by the State, . . . when it is 'entwined with governmental policies,' or when government is 'entwined in [its] management or control . . . .") (citations omitted).

"Under the joint action test, the Supreme Court has held that a 'willful participant in joint activity with the State or its agents' is a state actor." *Charles*, 18 F.4th at 696 (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). Therefore, a private citizen can be held liable when he or she conspires with a state actor to deprive the plaintiff of his constitutional rights." *Id.* (citing *Price*, 383 U.S. at 794; *Adickes v. S.H. Kress & Co.,* 398 U.S. 114, 152 (1970)).

On the evening of the incident in question, Wesson arrived on the scene and spoke to the responding deputies. Defendants DiStefano and Keeton were not present. As alleged, Wesson yelled threatening words at Davis (doc. 34-3 at 21; doc. 34-3 at 2), expressed disagreement with the responding officers' decision to refrain from arresting Davis (doc. 34-12 and 37-8 at 19:58-20:20; doc. 34-13 at 10), suggested Davis created the marks on his person and damaged the screen door himself (doc. 34-12 and 37-8 at 20:50-20:53; doc. 34-13 at 10; doc. 34-12 and 37-8 at 34:21-34:26; doc. 34-13 at 16), referred to the guns he owned (doc. 34-12 and 37-8 at 23:02-23:06; doc. 34-13 at 11; doc. 34-12 and 37-8 at 23:50-23:56; doc. 34-13 at 12), and expressed support for the police generally (doc. 34-12 and 37-8 at 24:18-24:34; doc. 34-13 at 12). In addition, Wesson informed the responding deputies that DiStefano constituted a family relation who lived nearby and attended family gatherings. (Doc. 34-12 and 37-8 at 35:14-35:40; doc. 34-13 at 17). Finally, the record suggests DiStefano took photographs of Katie's arms in Wesson's home. (Doc. 34-3 at 44; doc. 34-11 at 2-8).

The court need not parse these facts to determine whether Wesson conspired with state actors to violate Davis's rights. Nor need it determine whether Wesson may invoke qualified immunity as a private citizen. *See Filarsky v. Delia*, 566 U.S. 377, 392 (2012) (stating qualified immunity should not be extended to individuals "using the mechanisms of government to achieve their own ends."); *Pombert v. Glock, Inc.,* 171 F.Supp.3d 1321 (N.D. Ga. 2016) (finding private attorney for firearms dealer could not invoke qualified immunity in malicious prosecution case, where plaintiff alleged attorney conspired with state actors to effectuate the dealer's goals). Rather, the absence of probable cause simply defeats Davis's malicious prosecution claim against Wesson on the merits. *See Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016) ("The presence of probable cause defeats a claim of malicious prosecution.").

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.").

"To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook are of a type that fall within the employee's job responsibilities." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (quotation omitted). Even an unconstitutional act may constitute a discretionary function. *See Holoman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004) ("[W]e look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances."). Relevant here, "[s]ecuring an arrest warrant in response to reported criminal activity is a job-related function within a law enforcement officer's discretionary authority." *McWaters v. Houston*, No. 2:21-cv-57-RAH-SMD, 2022 WL 395309, at *5 (M.D. Ala. Feb. 8, 2022)) (citing *Carter*, 557 F. App'x at 907)). Therefore, DiStefano and Keeton engaged in discretionary functions vis-à-vis the claims at bar.

"When a court concludes [an official] was engaged in a discretionary function, 'the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity.'" *Hill v. Cundiff,* 797 F.3d 948, 978 (11th Cir. 2015) (emphasis in original)

(citation omitted). "To defeat qualified immunity, '(1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct.'" *Carruth v. Bentley*, 942 F.3d 1047, 1054 (11th Cir. 2019) (quoting *Taylor v. Hughes*, 920 F.3d 729, 732 (11th Cir. 2019)).

As described previously, the Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.; *see also Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020) ("One of the [Fourth] Amendment's protections is the right to be free from arrest without probable cause." (citation omitted)), *cert. denied*, 2021 WL 666396 (U.S. 2021); *Paez*, 915 F.3d at 1285 ("An arrest made without probable cause is an unreasonable seizure." (citing *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010)). The Supreme Court recognizes Fourth Amendment claims for "unreasonable seizure pursuant to legal process"—*i.e.*, malicious prosecution. *Thompson v. Clark*, 596 U.S. 36, 42 (2022); *Grider*, 618 F.3d at 1256 ("[T]he law requires that a warrant for an arrest be supported by 'sufficient information to establish probable cause.'" (citations omitted)); *see also* 32 Am. Jur. 2d False Imprisonment § 4, *Relation of malicious prosecution to false imprisonment or arrest in civil actions* (2024) ("[W]here the process on which an arrest is made is regular and legal in form and issued by a court of competent authority, but

issued maliciously and without probable cause, the remedy is an action for malicious prosecution.").

To succeed on such a claim on the merits, a plaintiff must prove "the elements of the common law tort of malicious prosecution" and "a violation of his Fourth Amendment right to be free from unreasonable seizures." *Blue v. Lopez*, 901 F.3d 1352, 1357 (11th Cir. 2018); *see also Luke*, 975 F.3d at 1143 ("To succeed on this claim, [plaintiff] must prove that he suffered a seizure pursuant to legal process that violated the Fourth Amendment and satisfy the elements of the common law tort of malicious prosecution." (internal citations and quotation marks omitted)). Noting a significant overlap exists between a Fourth Amendment violation pursuant to legal process and a common law malicious prosecution claim, *Luke*, 975 F.3d at 1144, the Eleventh Circuit streamlined the Fourth Amendment malicious prosecution standard into two elements: "a plaintiff must prove (1) that the defendant violated his Fourth Amendment right to be free from seizures pursuant to legal process and (2) that the criminal proceedings against him terminated in his favor." *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022) (citing *Luke*, 975 F.3d at 1144) (internal quotation marks omitted). There exists no dispute Davis satisfies the second prong, as the prosecution terminated in Davis's favor when the state *nol prossed* the case. Doc. 37-9 at 24-25.

Regarding the first prong, a plaintiff must demonstrate "the legal process justifying his seizure was constitutionally infirm," and "his seizure would not otherwise be justified without legal process." *Luke*, 975 F.3d at 1144 (citing *Williams*, 965 F.3d at

32

1165). Davis satisfies the latter requirement; Davis's arrest would not otherwise stand justified without legal process because home arrests require a warrant absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 590 (1980). The court finds no evidence of exigent circumstances (*e.g.*, destruction of evidence, escape, emergency assistance) that would justify a warrantless arrest in the present case. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Therefore, the analysis centers on whether the legal process causing the detention—the legal proceeding underlying the arrest warrant— was constitutionally infirm.

The legal process prescription under the Fourth Amendment includes proceedings to secure an arrest warrant. *Black v. Wigington*, 811 F.3d 1259, 1267 (11th Cir. 2016) (citation omitted); *see also Laskar v. Hurd*, 972 F.3d 1278, 1285 (11th Cir. 2020) ("Laskar alleges that he suffered a seizure pursuant to legal process. . . . Laskar alleges that state law enforcement obtained a warrant for his seizure. He also alleges that he was arrested and 'deprived of his personal liberty.' Taken together, these allegations suffice to plead a seizure pursuant to legal process."). To prove the constitutional infirmity of an arrest warrant, a plaintiff may establish either "the officer who applied for the warrant should have known that his application failed to establish probable cause," or "an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Williams*, 965 F.3d at 1165 (citations omitted).

1.  <u>The Criminal Complaint Established Probable Cause.</u>

  a.  *The criminal complaint was not defective.*

As an initial matter, Davis claims the arrest warrant in question contained a technical error preventing a finding of probable cause: although the criminal complaint submitted in support of the warrant purported to include an "officer's affidavit incorporated by reference" (doc. 37-9 at 5), the police report attached to the criminal complaint did not constitute a sworn statement. As such, he contends the police report may not factor into the court's probable cause determination. The undersigned disagrees.

The Fourth Amendment states, in relevant part, "no Warrants shall issue, but upon probable cause, *supported by Oath or affirmation*…." U.S. Const. amend. IV (emphasis added). To secure an arrest warrant, a police officer must supply a judicial officer "with sufficient information to support an independent judgment that probable cause exists for the warrant." *Overton v. Ohio*, 534 U.S. 982 (2001) (quoting *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 563 (1971)). "[T]he probable cause must be supported by sworn testimony or an affidavit." *United States v. Mercery*, 591 F. Supp. 3d 1369, 1375 (M.D. Ga. 2022) (emphasis added) (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)); *see also Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) ("Washington law requires, *in compliance with the constitutional command*, that an arrest warrant be supported by *either* an

affidavit 'or sworn testimony establishing the grounds for issuing the warrant.'"

(emphasis added)).[26]

An officer's affidavit "'consist[ing] of nothing more than his conclusion that ...

[plaintiff] perpetrated the offense described… [cannot] support the independent

judgment of [the] disinterested magistrate'" judge that probable cause existed to issue

an arrest warrant. *Luke*, 50 F.4th at 96 (quoting *Whiteley v. Warden, Wyo. State Penitentiary*,

401 U.S. 560, 565 (1971)) (alteration adopted); *see also Giordenello v. United States*, 357 U.S.

480, 486-87 (1958).  As the Eleventh Circuit explained:

> Under longstanding Supreme Court precedent, an officer must provide
> particular information to support an arrest warrant. *See Whiteley*, 401 U.S.
> at 564, 91 S.Ct. 1031; *Franks* [*v. Delaware*, 438 U.S. 154, 165 (1978)]. Our
> precedents agree—an officer who seeks an arrest warrant based on a
> 'conclusory affidavit' that 'clearly is insufficient to establish probable
> cause' is not entitled to qualified immunity." *Kelly* [*v. Curtis*, 21 F.3d 1544,
> 1555 (11th Cir. 1994)] (quoting *Garmon v. Lumpkin Cnty.*, 878 F.2d 1406,
> 1408 (11th Cir. 1989)).

---

[26] In Alabama, officials may commence a criminal proceeding either by indictment or complaint.  Ala.
R. Crim. P. 2.1.  The Alabama Rules of Criminal Procedure define a complaint as "a statement made
upon oath before a judge, magistrate, or official authorized by law to issue warrants of arrest, setting
forth essential facts constituting an offense and alleging that the defendant committed the offense."
Ala. R. Crim. P. 2.3.  The judicial official reviewing the complaint may issue a warrant of arrest if he
or she stands "reasonably satisfied" that an offense has been committed and that probable cause
supports the belief that the defendant committed the offense.  Ala. R. Crim. P. 2.4.  The official's
reasonable satisfaction may be derived from "the complaint *and the evidence*, if any ..."  Ala. R. Crim. P.
2.4 (emphasis added).

The Committee Comments to Rule 2.4 of the Alabama Rules of Criminal Procedure permit an official
to base his or her decision not only on the complaint or affidavits submitted therewith, but also on
"any testimony taken," and a judge or magistrate may "examine any witnesses, under oath, that he [or
she] deems necessary."  Ala. R. Crim. P. 2.4, Committee Comments.

*Luke*, 50 F.4th at 97; *see also Garmon v. Lumpkin Cnty., Ga.*, 878 F.2d 1406, 1409 (11th Cir. 1989) (finding no probable cause existed because "the magistrate … issued the warrant on the stated basis of 'sufficient causes made known to me *in the above affidavit*,'" and the affidavit "contained nothing but the investigator's conclusion that [plaintiff] had committed the crime" (emphasis added)).

In the present case, the criminal complaint reads as follows:

> Before me, the undersigned authority, personally appeared this day the undersigned complainant who, duly sworn, state on oath that he/she has probable cause for believing, and does believe, that Mark Dion Davis, defendant, whose name is otherwise unknown to the complainant, did, prior to the commencement of this action, on or about 10/03/2020 … commit the offense of Domestic Violence 3rd Harassment within the County of Lauderdale …, in that he/she did … See attached officer's affidavit incorporated by reference[ ] in violation of Section 13A-6-132, Ala. Code 1975….

(Doc. 37-9 at 5 (underlined portion in original).  Although the criminal complaint explicitly refers to an attached affidavit in response to request for "specific facts," no formal affidavit appears in the case file.  (*Id.*).[27]

The absence of a formal affidavit does not automatically render a criminal complaint invalid, as a judicial officer may consider (1) sworn oral testimony and (2) other extrinsic evidence to undertake a probable cause assessment. *See Wallace v. Smith*,

---

[27] An affidavit constitutes "[a] voluntary declaration of facts written down and sworn to by a declarant, [usually] before an officer authorized to administer oaths."  Affidavit Definition, *Black's Law Dictionary* (12th ed. 2024).  More specifically, a probable cause affidavit constitutes "[a] law-enforcement affidavit that sets forth facts and circumstances for making an arrest or performing a search, made to support a request for a judge to issue a warrant or to justify after the fact why an arrest or a search has been made without a warrant."  Probable Cause Affidavit Definition, *Black's Law Dictionary* (12th ed. 2024). Based on these definitions, a police report does not constitute an affidavit.

297 F. App'x 915, 916 (11th Cir. 2008) (unpublished) (per curiam) ("However, the Fourth Amendment does not bar consideration of 'an affiant's oral testimony, extrinsic to the written affidavit, which is sworn before the issuing magistrate, in determining whether the warrant was founded on probable cause.'" (quoting *United States v. Hill*, 500 F.2d 315, 320-21 (5th Cir. 1974), *abrogated in part on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983); *Garmon v. Lumpkin Cnty., Ga.*, 878 F.2d 1406, 1409 n.1 (11th Cir. 1989)); *Hill*, 500 F.2d at 320 n.2 ("In two cases arising from state criminal convictions the Supreme Court intimated that sworn oral testimony before a state magistrate in an application for a search or arrest warrant may constitutionally supplement an affidavit which, on its face, fails to establish probable cause for its issuance." (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971); *Aguilar v. Texas*, 378 U.S. 108, 109 n.1 (1964), *abrogated in part on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983); *United States ex rel. Gaugler v. Brierley*, 477 F.2d 516, 520-22 (3d Cir. 1973)); *Garmon*, 878 F.2d at 1409 n. 1) ("If the warrant stated that its issuance was based on probable cause shown, for example, we might presume that oral testimony was presented which supported the magistrate's determination. In this case, however, we know that no probable cause existed because the warrant explicitly states that it is supported by information sworn to 'in the above affidavit.'"); *Rock v. Lowe*, 893 F. Supp. 1573, 1580 (S.D. Ga. 1995) ("In this case [the magistrate judge] had sufficient evidence upon which to base a finding of probable cause.  Although the affidavit that [the officer] signed in support of the arrest warrant only included a conclusory statement that [the suspect]

had committed the armed robbery, and thus, was insufficient to support the arrest warrant by itself, *see United States v. Ventresca*, 380 U.S. 102, 107 (1965), [the officer] submitted other documentation and information with the affidavit that provided a sufficient basis for the magistrates' determination of probable cause." (cleaned up)); *Crittenden v. State*, 476 So. 2d 626 (Ala. Crim. App. 1983) ("The court may look beyond the affidavit to ascertain what other information may have been furnished [to] the magistrate. If the additional information, together with the affidavit information, supports issuance of the warrant, then it is saved."). In addition, the court "'must also keep in mind the fact that we generally accord official conduct a presumption of legitimacy.'" *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) (quoting *United States Dep't of State v. Ray*, 502 U.S. 164, 179 (1991)) (internal punctuation omitted).

In the present case, the court may presume Investigator Keeton presented oral testimony because the criminal complaint indicates Investigator Keeton personally appeared before a judicial officer and stated under oath her belief that probable cause existed as to Davis's commission of the third-degree domestic violence. Moreover, Investigator Keeton attached a police report to the criminal complaint. Together, Keeton's sworn testimony "and the evidence" may form the basis for probable cause. Ala. R. Crim. P. 2.4.

b. *The criminal complaint did not reasonably fail to establish probable cause.*

To determine whether probable cause exists in the context of a malicious prosecution claim, the court must ask "whether a reasonably well-trained officer in [the defendant's] position would have known that his affidavit [in addition to sworn testimony and/or extrinsic evidence submitted to the judicial officer] failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 345 (1986) (footnote omitted). "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable . . . will the shield of immunity be lost." *Malley*, 475 U.S. at 344-45 (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)); *see also Kelly v. Curtis*, 21 F.3d 1544, 1555 (11th Cir. 1994) ("[T]he Supreme Court held that qualified immunity does not protect an officer who seeks a warrant on the basis of an affidavit that does not show reasonably objective probable cause—even if the magistrate erroneously issues the warrant." (citing *Malley*, 475 U.S. at 344-45)).

Unlike a false arrest claim challenging an arrest without legal process, "probable cause in a malicious-prosecution claim challenging an arrest pursuant to a warrant can't be shown by reference to information in an officer's investigative file or mind *absent a 'record … that he submitted the file to or explained his thought process to the magistrate judge.'*" *Butler v. Smith*, 85 F.4th 1102, 1113 (11th Cir. 2023) (quoting *Luke v. Gulley*, 50 F.4th 90, 96 (11th Cir. 2022)) (emphasis added). Hence, "an otherwise insufficient affidavit cannot be rehabilitated [with] information possessed by the [officer] when he sought the

warrant but not disclosed to the issuing magistrate." *Williams*, 965 F.3d at 1162 (quoting

*Whiteley v. Warden*, 401 U.S. 560, 565 n.8 (1971)) (alteration in original); *W. Point-Pepperell,*

*Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) (finding judicial review of whether an

officer's affidavit contains probable cause "must be strictly confined to the information

brought to the magistrate's attention" (citations omitted)).[28]

        "In the context of an arrest, probable cause exists when the facts, considering

the totality of the circumstances and viewed from the perspective of a reasonable

officer, establish a probability or substantial chance of criminal activity." *Parker v.*

*Thurman*, 2022 WL 1184403, at *3 (11th Cir. Apr. 21, 2022) (citing *District of Columbia v.*

*Wesby*, 583 U.S. 48, 56-57 (2018)).    "Probable cause does not require conclusive

evidence and is not a high bar." *Id.* (citation and quotations omitted).  A showing of

probable cause "'requires only a probability or substantial chance of criminal activity,

---

[28] In a malicious prosecution case where the seizure in question occurred pursuant to legal process but would have nevertheless stood reasonable *without* a warrant (*i.e.*, a seizure resulting in only a "brief period of detention," *Gerstein v. Pugh,* 420 U.S. 103, 113–14 (1975); *Cty. Of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991) (holding 48-hour detention without legal process presumptively unconstitutional)), courts may consider all "information known to the officers *but not communicated to the [magistrate]*" to determine whether arguable probable cause existed.  *Harris v. Hixon*, 102 F.4th 1120, 1134 (11th Cir. 2024) (emphasis added); *see also Williams v. Aguire*, 965 F.3d 1147, 1164 (11th Cir. 2020) (noting arrests pursuant to legal process in *Wood v. Kesler*, 323 F.3d 872 (11th Cir. 2003), and *Carter v. City of Melbourne*, 731 F.3d 1161 (11th Cir. 2013), would have been constitutional without a warrant, thereby "resolv[ing] the claim of malicious prosecution in such a way that made the validity of the warrant 'immaterial.'") (quoting *United States v. Francis*, 487 F.2d 968, 972 (5th Cir. 1973)).

In the present case, Davis's seizure would not have complied with the Constitution absent a warrant. Although officers detained Davis for a single night, they effectuated the arrest within Davis's home. Officers must possess an arrest warrant to enter a suspect's home absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 590 (1980).  Because the record does not indicate the presence of exigent circumstances (*e.g.*, destruction of evidence, escape, emergency assistance), this court's assessment of arguable probable cause may only refer to the evidence definitively presented to the judicial officer.

not an actual showing of such activity.'" *Wesby*, 138 S. Ct. at 586 (citations omitted).

"A reviewing court must simply ask 'whether a reasonable officer *could* conclude . . .

that there was a substantial chance of criminal activity.'" *Washington*, 25 F.4th at 899

(quoting *Wesby*, 138 S. Ct. at 588) (emphasis in original).

The existence of probable cause "'depends on the elements of the alleged crime

and the operative fact pattern.'" *Stallworth v. Hurst*, No. 21-10731, 2021 WL 6143557,

at *2 (11th Cir. Dec. 30, 2021) (per curiam) (citing *Gates v. Khokhar*, 884 F.3d 1290, 1298

(11th Cir. 2018)).  Courts must not examine facts in isolation but "'consider the whole

picture' because 'the whole is often greater than the sum of its parts.'" *Manners v.

Cannella*, 891 F.3d 959, 969 (11th Cir. 2018) (citing *Wesby*, 138 S. Ct. at 588).  "Because

probable cause 'deals with probabilities and depends on the totality of the

circumstances,' . . . it is 'a fluid concept' that is 'not readily, or even usefully, reduced to

a neat set of legal rules.'" *Wesby*, 138 S. Ct. at 586 (citations omitted).  Lastly, "in

deciding whether probable cause exists, [officers] are not required to sift through

conflicting evidence or resolve issues of credibility, so long as the totality of the

circumstances present a sufficient basis for [probable cause]." *Paez*, 915 F.3d at 1286

(citation and internal quotation marks omitted).

In the context of malicious prosecution claims, courts employ a charge-specific

approach to probable cause.  *See Williams*, 965 F.3d at 1162 ("Regardless of its

applicability to warrantless arrests, the any-crime rule does not apply to claims of

malicious prosecution under the Fourth Amendment. Centuries of common-law

doctrine urge a charge-specific approach, and bedrock Fourth Amendment principles support applying that approach in the context of the charges that justified a defendant's seizure.").

In the present case, the criminal complaint indicates Officer Keeton suspected Davis of committing the crime of harassment as the predicate underlying offense for the domestic violence charge. *See* doc. 37-9 at 5. Accordingly, the evidence presented to the judicial official must establish probable cause existed to arrest Davis on the specific charge of "Domestic Violence 3rd Harassment" specified in the criminal complaint. In pertinent part, Alabama Code § 13A-6-132(a)(1) provides that a person commits third-degree domestic violence if they commit the crime of harassment pursuant to Alabama Code § 13A-11-8(a) and the victim is a current or former spouse, parent, step-parent, child, step-child, grandparent, step-grandparent, grandchild, step-grandchild, any person with whom the defendant has a child in common, a present household member, or a person who has or had a dating relationship with the defendant.

Alabama Code § 13A-11-8(a)(1) defines harassment as "[s]trik[ing], shov[ing], kick[ing], or otherwise touch[ing] a person or subject[ing] him or her to physical contact" or "[d]irect[ing] abusive or obscene language or mak[ing] an obscene gesture towards another person" with the intent to "harass, annoy, or alarm" that person. "When a term is not defined in a statute, the commonly accepted definition of the term

should be applied." *City of Montgomery v. Zgouvas*, 953 So.2d 434, 442-43 (Ala. Crim. App. 2006) (quoting *Ex parte Gadsden Reg'l Med. Ctr.*, 904 So.2d 234, 236 (Ala. 2004)).

"Merriam-Webster's Online Dictionary provides the following reasonably applicable definitions of 'harass': 'to annoy persistently' or 'to create an unpleasant or hostile situation for someone especially by uninvited and unwelcome verbal or physical conduct.' 'Harass,' Merriam-Webster Online Dictionary (2015), http://www.merriam-webster.com/dictionary/harass." *United States v. Shepheard*, 2:15–CR–00031–JHE, 2015 WL 3887332, at *5 (N.D. Ala. June 24, 2015). Relatedly, "[t]o annoy has been defined as 'to irritate, bother, or make somewhat angry, as by a repeated action, noise, et.,' and 'to harm by repeated attacks; harry; molest.'" *People v. Sirlin*, 2003 WL 22849772, at *5 (N.Y. J. Ct. Town of New Castle, Feb. 10, 2003) (quoting Webster's New World College Dictionary (4th ed. 2001)).[29]  Finally, "Merriam-Webster's Collegiate Dictionary 28-29 (11th ed. 2005), provides four definitions for the noun 'alarm.'  The only definition that would be applicable to the use of 'alarm' in §13A-11-8(b)(1)a. is 'sudden sharp apprehension and fear resulting from the perception of imminent danger.'" *Zgouvas*, 953 So.2d at 442.

Construing the facts of the case in a light most favorable to Davis, the undersigned will only review the information chronicled in the documents attached to

---

[29] "New York's harassment statute is similar to Alabama's and provides that '(a) person is guilty of harassment when, with intent to harass, annoy, or alarm another person: 1. He strikes, shoves, kicks or otherwise subjects him to physical contact, or attempts or threatens to do the same.'" *Crook v. State*, 469 So. 2d 692 (Crim. App. Ala. 1985).

the criminal complaint. (Doc. 37-9 at 8-14; see also doc. 37-9 at 16 ("It appears from the record that a report or narrative … of officer(s) was attached."); doc. 34-1 at 13 ("That with the 'see attached report' standing in as the affidavit that should be on that complaint, and the report was submitted with that complaint to the clerk's office, as every other domestic violence case.")). As such, the court assumes Keeton did not communicate other external information or personal knowledge to the judicial officer.

As probable cause constitutes a low bar, the undersigned finds the police report attached to the criminal complaint contains sufficient information to justify the judicial officer's probable cause determination.[30]

Deputy Brown's narrative included in the report attached to the criminal complaint contains the following evidence:

- o Deputy Brown responded to a "domestic between father [Davis] and daughter [Katie]" at Davis's home.
- o Both Davis and Katie prepared written statements.
- o Davis stated Katie became violent towards him.
- o Davis stated he attempted to restrain Katie.
- o Katie stated Davis became violent towards her and put his hands around her neck.
- o The deputies observed an abrasion on Davis's arm but no marks on Katie.
- o Katie removed her belongings from the residence and left the premises.

(Doc. 37-9 at 9-10).

---

[30] Although courts must construe facts in the light most favorable to the non-moving party at the summary judgment stage, "it is what [the judicial officer] knew that matters" for purposes of this court's probable cause determination. *Davis v. City of Apopka*, 356 F. Supp. 3d 1366 (M.D. Fla. 2018).

Keeton's narrative in the report contains the following statements from Katie

Davis:

- o Davis texted Katie and told her she needed to find another place to live.
- o Katie drove with Landon to Davis's house to retrieve her belongings.
- o Davis looked out the window as Katie and Landon approached in Landon's vehicle.
- o Katie walked to the door and Landon stayed in the vehicle.
- o Davis did not answer the door and Katie let herself in with her keys.
- o Davis came to Katie's bedroom with a belt and attempted to hit Katie with it.
- o Davis took Katie's car keys away and refused to give them back.
- o Davis pinned Katie against an interior wall.
- o Katie went to Landon's truck to deposit some of her belongings and attempted to re-enter Davis's home.
- o Davis grabbed Katie by the arms.
- o Davis threatened to "lay [Katie's] ass on the ground."
- o Davis put his hand around Katie's throat and applied pressure for approximately a minute.

(*Id.* at 14).

Finally, Keeton's narrative in the report recounted the following statements from

Landon Beard:

- o Landon observed Davis put his hand around Katie's neck and push her up against the home's exterior wall.
- o Landon observed Davis swinging at Katie with an open hand.
- o From his vehicle, Landon called his mother.
- o Landon's mother called 911.

(*Id.*).

In the present case, the evidence contained in the police narratives give rise to

probable cause Davis committed the crime of third-degree domestic violence, inclusive

of the predicate crime of harassment. Principally, consistent statements elicited from Katie and Landon indicate Davis pushed Katie against the home's exterior wall and held her there by her throat. Moreover, Davis admitted attempting to restrain Katie.[31] Thus, a reasonable judicial officer could construe such facts to suggest Davis shoved or otherwise touched Katie to "create an unpleasant or hostile situation" (*Shepheard*, 2015 WL 3887332 at *5 (quotation marks and citation omitted)) or a "sudden sharp apprehension and fear resulting from the perception of imminent danger" (*Zgouvas*, 953 So.2d at 442) within the meaning of Alabama's harassment statute. In addition, the police reports establish Katie constituted Davis's child within the meaning of the Alabama third-degree domestic violence statute.

Davis argues the police report attached to the criminal complaint consists of "only hearsay and … no corroborating evidence such as factual evidence or data that can corroborate that hearsay." (Doc. 37 at 8). That contention does not obviate a finding of probable cause. Evidence supporting a probable cause determination may rely on hearsay corroborated by other sources. *See Illinois v. Gates*, 462 U.S. 213, 244 (1983) ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" (citing *Jones v. United States*, 362 U.S. 257, 269 (1960), *overruled in part by United States v. Salvucci*, 448 U.S. 83

---

[31] Deputy Brown's narrative indicates Davis and Katie provided written statements summarizing their accounts of the altercation, lending credence to the aforementioned facts.

(1980)); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1166 n.13 (11th Cir. 2005) (finding probable cause for extraditability determination where "the magistrate's probable cause determination was based on more than mere unsupported allegations" because "the magistrate judge found the victims' statements were consistent with each other and were corroborated by the statements of non-victims").

Relatedly, courts routinely confirm probable cause based on victim reports or witness statements. *See Rankin v. Evans,* 133 F.3d 1425, 1441 (11th Cir. 1998) (holding officers may rely on a victim's report as support for probable cause); *Arnold-Rogers v. City of Orlando*, 660 F. App'x 819 (11th Cir. 2016) ("[The officer] had probable cause to arrest [the suspect] for battery based on the information he knew at the time of the arrest. Although [the suspect] denied touching [the victim], [the victim and another eyewitness] provided [the officer] with sworn statements that [the suspect] shoved [the victim] multiple times. Keeping in mind that officers are not required to resolve credibility issues in deciding whether probable cause exists, under the totality of the circumstances there was a sufficient basis for a prudent person to believe that [the suspect] had committed a battery."); *Davis v. Orange Cty. Sheriff's Off.*, No. 620CV1400ORL37DCI, 2020 WL 6144654, at *2 (M.D. Fla. Oct. 6, 2020) ("The Eleventh Circuit has recognized that a single witness'[s] statements are enough to establish probable cause." (citing *Martin v. Wood*, 648 F. App'x 911, 916 (11th Cir. 2016)); *see United States v. Hodge*, 714 F.3d 380, 384–85 (6th Cir. 2013) ("Statements from a source named in a warrant application . . . are generally sufficient to establish probable cause

without further corroboration because the legal consequences of lying to law enforcement officials tend to ensure reliability." (citation omitted)); *Huebner v. McDonough*, 2018 WL 11149778 (S.D. Fla. Apr. 16, 2018) ("Viewing the circumstances as a whole, and because the Deputy received a sworn statement from [the victim] following her 911 call, indicating that Plaintiff had punched her in the face and pulled her hair, the Deputy had probable cause to believe that Plaintiff had intentionally touched [the victim] against her will.").

In further efforts to parry a qualified immunity ruling, Davis contends he validly exercised force against his daughter as a means of self-defense and/or parental discipline, vitiating any probable cause determination.  (*See, e.g.,* doc. 50 at 17).  Davis errs on both accords.

Alabama Criminal Code § 13A-3-23(a) states, in relevant part, "A person is justified in using physical force upon another person in order to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be necessary for the purpose." That said, "a person is not justified in using physical force" if "[w]ith intent to cause physical injury or death to another person, he or she provoked the use of unlawful physical force by such other person" or if he or she otherwise constituted the "initial aggressor." Ala. Crim. Code § 13A-3-23(c).  A person who uses justified physical force stands "immune from criminal prosecution and civil action for the use of such force,

unless the force was determined to be unlawful." Ala. Crim. Code § 13A-3-23(d). Finally, "[a] law enforcement agency may use standard procedures for investigating the use of force described in subsection (a), but the agency may not arrest the person for using force *unless it determines that there is probable cause that the force used was unlawful.*" Ala. Crim. Code § 13A-3-23(e) (emphasis added).

Alabama Criminal Code § 13A-3-24 provides, in relevant part: "A parent, guardian, or other person responsible for the care and supervision of a minor or an incompetent person … may use reasonable and appropriate physical force upon the minor or incompetent person when and to the extent that he reasonably believes it necessary and appropriate to maintain discipline or to promote the welfare of the minor or incompetent person."[32]

As an initial matter, the Defendants did not need to assess possible defenses to the probable cause finding that Davis committed domestic violence. That is, the law did not require the Defendants "to sift through conflicting evidence" because "the totality of the circumstances [already] present[ed] a sufficient basis for believing that an offense ha[d] been committed." *Huebner v. Bradshaw,* 935 F.3d 1183, 1188 (11th Cir. 2019) (citation omitted); *Davis v. Orange Cty. Sheriff's Off.,* No. 6:20-cv-1400-Orl-37DCI,

---

[32] The parental discipline statute does not define the term "minor." *See* Ala. Code 1975, § 13A-3-20 (Definitions). Elsewhere, the Alabama Criminal Code defines "minor" as "[a] person under the age of 19," § 13A-6-151(5) (human trafficking), or "[a]ny unmarried person under the age of 18 years," § 13A-12-200.1(16) (obscenity). Alabama Code § 15-20A-4(134) defines "minor" as "[a] person who has not attained the age of 18." Based on these conflicting definitions, there appears no clearly established law explicating whether an eighteen-year-old constitutes a minor in the parental discipline context.

2020 WL 6144654, at *2 (M.D. Fla. Oct. 6, 2020) ("If it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause." (citation and internal quotation marks omitted)).  The circumstances do not depict a situation in which Keeton conducted an investigation in a biased manner, deliberately elected not to obtain evidence, or consciously ignored any evidence that she already possessed.  *See Washington v. Rivera*, 939 F.3d 1239, 1248 (11th Cir. 2019) (explaining prior Eleventh Circuit case law found officers liable when they "conduct an investigation in a <u>biased</u> fashion or <u>elect</u> not to obtain easily discoverable facts," or "consciously ignore[ ] information they already possessed that cast significant doubt on whether a [person] was guilty" (citations omitted)).

Consequently, an "officer or judge, in determining the existence of probable cause to arrest, 'need not take every conceivable step at whatever cost to eliminate the possibility of convicting an innocent person.'" *Turner v. Williams,* 65 F.4th 564, 585 (11th Cir. 2023) (quoting *Rankin*, 133 F.3d at 1436)).  That is, an officer need not "forego arresting [a suspect] based on initially discovered facts showing probable cause simply because [the suspect] offered a different explanation."  *Marx v. Gumbinner*, 905 F.2d 1503, 1507 n.6 (11th Cir. 1990); *see also Wesby*, 138 S. Ct. at 588 ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."); *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019) ("A law enforcement officer is not required to resolve every inconsistency found in the evidence. Moreover, police officers

aren't lawyers; we do not expect them to resolve legal questions or to weigh the viability of most affirmative defenses. So long as it is reasonable to conclude from the body of evidence as a whole that a crime was committed, the presence of some conflicting evidence or a possible defense will not vitiate a finding of probable cause.") (internal citation omitted); *Rickerson v. Jeter*, No. 21-12563, 2022 WL 2136017, at *3 (11th Cir. June 14, 2022) ("We have repeatedly held that the existence of facts that give rise to an affirmative defense does not defeat probable cause, actual or arguable."); *Rankin v. Board of Regents of University System of Georgia*, 732 Fed. App'x 779, 781 (11th Cir. 2018) ("[W]hether Rankin acted in self-defense goes to an affirmative defense, not to probable cause."); *Harvey v. Carr*, 616 Fed. App'x 826, 829 (6th Cir. 2015) ("[W]hen the facts known to the officer track the elements of an offense, we routinely grant qualified immunity … even when the suspect asserts, or circumstances suggest, an applicable affirmative defense.").

Most importantly, a law enforcement officer need not consider potential affirmative defenses unless he or she "actually has knowledge of facts and circumstances *conclusively establishing an affirmative defense*." *Williams v. Sirmons,* 307 F. App'x 354, 358 (11th Cir. 2009) (emphasis added)*; see also Painter v. Robertson*, 185 F.3d 557, 571 n.21 (6th Cir. 1999) ("[W]here a reasonable police officer would conclusively know that an investigative target's behavior is protected by a legally cognizable affirmative defense, that officer lacks a legal foundation to arrest that person for that behavior.").

As discussed previously, the report attached to the criminal complaint established, at a minimum, that (1) Katie constituted Davis's eighteen-year-old daughter; (2) both Katie and Landon testified Davis put his hand around Katie's throat to restrain her; (3) Davis admitted attempting to restrain Katie in self-defense; and (4) the responding officers noted an abrasion on Davis's arm but no marks on Katie. These circumstances do not conclusively establish Davis lawfully exercised force against his daughter, as reasonable minds might differ as to whether Davis's suspected actions exceeded reasonably necessary bounds. Because the facts Keeton supplied to the judicial officer track the elements of third-degree domestic violence, the probable cause determination remains valid. *See Sada*, 434 Fed. App'x at 851 ("[E]ven if we assume that officers are required to consider affirmative defenses in their probable cause calculations [regarding the crime of battery], the application of Florida's parental discipline privilege was not sufficiently established in this case. As the record shows, based on the eye witnesses' accounts of the altercation, in which one eye witness communicated that Sada had 'socked' his son, prevented [sic] the conclusiveness of the parental physical discipline privilege"); *Rivera v. City of Jacksonville*, Case No. 3:24-cv-640-MMH-SJH, 2024 WL 4682402, at *7 (M.D. Fla. Oct. 9, 2024) ("Given the totality of the circumstances, even accepting Plaintiff's version of events (which the officers were not required to do), application of any parental privilege or affirmative defense was not sufficiently settled to negate the otherwise apparent crimes. Rather, officers could have construed what Plaintiff admits—that he 'reacted to protect himself and his property'

and 'grabbed [his daughter] and held her down' for a period of time—as beyond reasonable parental discipline."); *Drew v. Shouse,* No. 3:17-cv-991-J-34JBT, 2018 WL 3930117, at *10 (M.D. Fla. Aug. 16, 2018) (dismissing false arrest claim in light of qualified immunity defense where "a reasonable officer in the same circumstances … could have concluded that she lacked sufficient facts to conclusively determine that [the suspect] was justified in shooting [the victim]" where video footage depicted "a rapidly intensifying conflict between [the suspect and the victim], beginning first with heated words, then escalating to [the victim] striking [the suspect], and finally culminating with [the suspect] shooting [the victim] in the face"); *Gevarzes v. City of Port Orange*, No. 6:12–cv–1126–Orl–37DAB, 2013 WL 610456, at *5 (M.D. Fla. Feb. 19, 2013) ("Here, there is no dispute that Plaintiff bit her boyfriend. The officers were called to the scene after Plaintiff argued with [an eyewitness] and bit [the victim]. Though Plaintiff alleges, and the Court must accept as true, that she was acting 'purely defensive[ly];' the fact remains that she bit someone. The law does not require officers to take the possibility of self-defense into account when they arrive on the scene of a domestic disturbance and it is undisputed that one party bit another."); *Harvey*, 616 Fed. App'x at 829 ("This record presents no material dispute of fact whether [the officer] knew conclusively that the parental-discipline statute protected [the suspect's] use of force, i.e., that [the suspect] believed the slap was necessary to promote [the victim's] welfare and that the slap posed no substantial risk of extreme pain or mental distress. At the time of arrest, [the officer] knew that [the suspect] loudly slapped [the victim], causing him pain. [The officer] also

knew that the altercation spiraled 'out of control.'  The undisputed facts tracked the elements of fourth-degree assault [under Kentucky law], and nothing required [the officer] to inquire further to discover [the suspect's] affirmative defense.") (citations omitted).

    2.    <u>Defendants Did Not Lodge Any Intentional or Reckless Misstatements or Omissions in the Criminal Complaint</u>.

As an alternative basis to sustain his Fourth Amendment claims, Davis must "'identify affirmative evidence from which a jury could find that'" Defendants lied in support of the criminal complaint.  *Williams*, 965 F.3d at 1166 (citation omitted). "Negligent misstatements or omissions" do not violate the Fourth Amendment.  *Paez*, 915 F.3d at 1287 (citing *Kelly*, 21 F.3d at 1555).  The Eleventh Circuit deploys a two-part test for the inquiry at bar.  "First, we ask whether there was an intentional or reckless misstatement or omission."  *Id.*  "Then, we examine the materiality of the information by inquiring whether probable cause would be negated if the offending statement was removed or the omitted information included."  *Id.* (citations omitted).

As for the first part of the test, "qualified immunity bars such claims unless 'the plaintiff can prove that the officer *perjured himself*—that is, put forth information *he did not believe or accept as true*—in order to obtain a search warrant.'"  *Woodring v. Hart*, No. 614-CV-1067-ORL-37, 2015 WL 2238056, at *3 (M.D. Fla. May 12, 2015) (emphasis in original) (quoting *Carter v. Gore*, 557 F. App'x 904, 908 (11th Cir. 2014)).  "Accordingly, at the motion to dismiss stage, viably alleging a perjurious-statement malicious-

prosecution claim requires factual allegations bearing on the officer's 'subjective belief about the veracity of the assertions made in his affidavit.'"  *Id.* (citing *Carter*, 557 F. App'x at 910).  "'General attacks upon a defendant's credibility' are not enough to meet this burden. . . .  Nor are conclusory allegations and speculation."  *Williams*, 965 F.3d at 1165–66 (citations omitted).

In the present case, the court identifies the following information missing from the criminal complaint and relevant attachments: (1) Davis's statement indicating he restrained Katie as a means of parental discipline, (2) a closed-fist bruise on Davis's chest, and (3) Davis's statement indicating Katie's pupils appeared dilated.  Crucially, however, the foregoing "omissions" are not sufficiently material.

As discussed previously, a possible parental-discipline defense does not negate probable cause in this instance.  In particular, the issuing judicial officer knew (1) Katie constituted Davis's eighteen-year-old daughter; (2) both Katie and Landon testified Davis put his hand around Katie's throat to restrain her; (3) Davis admitted attempting to restrain Katie in self-defense; and (4) the responding officers noted an abrasion on Davis's arm but no marks on Katie.  These circumstances do not conclusively establish Davis lawfully exercised force against his daughter, as reasonable minds might differ as to whether Davis's suspected actions exceeded reasonably necessary bounds.

Likewise, evidence indicating Davis sustained a bruise on his chest would not sway the judicial officer's probable cause determination, as such facts do not counteract information suggesting Davis held Katie against the exterior wall of the home by her

throat. Moreover, the record indicates Davis discovered the bruise after his arrest and release, indicating Defendants did not omit such information intentionally.

Finally, evidence suggesting Katie's pupils appeared dilated would not materially alter the criminal complaint. Even if dilated pupils indicated drug or alcohol use, Katie's suspected intoxication would not render Davis's self-defense or parental-discipline justifications conclusive.

Nor did Keeton render statements she knew to be false, as all evidence contained in the police report attached to the criminal complaint corroborates the body-worn camera footage and the additional witness statements. Therefore, the criminal complaint did not contain any intentional or reckless misstatements or omissions.

Based upon the foregoing review, the court **DISMISSES** Count III because DiStefano and Keeton deserve qualified immunity as to the Fourth Amendment malicious prosecution claim. The existence of probable cause defeats Davis's malicious prosecution claim against Wesson on the merits.

## C. The Court Dismisses Count V Because Davis Cannot Prove an Actual Denial of His Constitutional Rights.

To state a conspiracy claim under 42 U.S.C. § 1983, a plaintiff "must show an underlying actual denial of [his] constitutional rights." *GJR Investments, Inc. v County of Escambia, Fla.*, 132 F.3d 1359, 1370 (11th Cir. 1998), *rev'd on other grounds by Randall v. Scott*, 610 F.3d 707, 709 (11th Cir. 2010). Moreover, "a plaintiff 'must show that the parties 'reached an understanding' to deny the plaintiff his or her rights [and] prove an

actionable wrong to support the conspiracy." *Bailey v. Board of County Comm'rs of Alachua County*, 956 F.2d 1112, 1122 (11th Cir. 1992) (quoting *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990), *cert. denied*, 500 U.S. 932 (1991)). "[T]he linchpin for conspiracy is agreement, which presupposes communication." *Id.* The court must dismiss conclusory allegations of a conspiracy absent evidence demonstrating defendants reached an understanding. *See Harvey v. Harvey*, 949 F.2d 1127, 1133 (11th Cir. 1992); *Fullman v. Graddick*, 739 F.2d 553, 556–57 (11th Cir. 1984).

The court need not decide whether Defendants entered into an agreement or engaged in an actionable wrong in furtherance of that agreement because no underlying constitutional violation occurred. As discussed at length, Davis's false arrest claim fails because the arrest occurred pursuant to legal process. Moreover, Davis's malicious prosecution claim fails because probable cause justified issuance of the arrest warrant. Therefore, Davis cannot prove the arrest warrant stood constitutionally infirm, defeating any claim for conspiracy. *See Spencer v. Benison*, 5 F.4th 1222, 1234 (11th Cir. 2021) ("Because [plaintiff] failed to establish an underlying violation of his constitutional rights, which is required to sustain a § 1983 conspiracy claim, we reverse the district court's denial of [defendant's] motion for summary judgment on [plaintiff's] § 1983 conspiracy claim.").

## II.   STATE LAW CLAIMS

### A. The Court Dismisses Count II Because the Arrest in Question Occurred Pursuant to Legal Process.

As under federal law, the proper channel for Davis's state law claims proceeds under malicious prosecution, not false arrest. "[I]f an arrest is made pursuant to a warrant issued by a lawfully authorized person, neither the arrest nor the subsequent imprisonment is 'false,' and, as a consequence, the complaining party's action must be one for malicious prosecution.'" *Goodwin v. Barry Miller Chevrolet, Inc.,* 543 So.2d 1171, 1176 (Ala. 1989) (quoting *Blake v. Barton Williams, Inc.,* 361 So.2d 376, 378 (Ala. Civ. App. 1978)); *see also Carter v. City of Montgomery*, 473 F. Supp. 3d 1273, 1306 (M.D. Ala. 2020) (citing *Goodwin*, 543 So. 2d at 1176). Accordingly, the court **DISMISSES** Davis's state law false arrest claim.

## B. The Court Dismisses Count IV Because Probable Cause Justified Issuance of the Arrest Warrant.

In Alabama, "'[t]he elements of malicious prosecution are: (1) a judicial proceeding initiated by the defendant, (2) the lack of probable cause, (3) malice, (4) termination in favor of the plaintiff, and (5) damage.'" *Haynes v. Coleman*, 30 So.3d 420, 423 (Ala. 2009) (quoting *Cutts v. American United Life Ins. Co.*, 505 So.2d 1211, 1214 (Ala. 1987)).

DiStefano and Keeton assert state-agent immunity as to the malicious prosecution claim.[33] "State-agent immunity protects state employees, as agents of the

---

[33] Defendants DiStefano and Keeton raise the defense of absolute immunity, as Alabama's constitution maintains "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. art. I, § 14. However, the court need not resolve this issue, as probable cause justified the arrest warrant and thus entitles DiStefano and Keeton to state-agent immunity.

State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So.2d 117, 122 (Ala. 2002). Under the burden-shifting framework established by the Alabama Supreme Court, a state agent bears the burden of demonstrating the plaintiff's claims arose from a discretionary function that would entitle the state agent to immunity. *Giambrone v. Douglas*, 874 So.2d 1046, 1052 (Ala. 2003); *Ex parte Wood*, 852 So.2d 705, 709 (Ala. 2002). Next, the burden shifts to the plaintiff to prove the state agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. *Giambrone*, 874 So.2d at 1052; *Wood*, 852 So.2d at 709; *Ex parte Davis*, 721 So.2d 685, 689 (Ala.1998).

In the present case, Defendants DiStefano and Keeton qualify as state agents because securing an arrest warrant and effectuating an arrest constitute discretionary functions. *See Ex parte Cranman,* 792 So.2d 392, 405 (Ala. 2000) (noting "[a] State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's … exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons").

Upon the burden shift, however, Davis cannot demonstrate Defendants acted "willfully, maliciously, fraudulently, in bad faith, or beyond [their] authority" because probable cause justified issuance of the arrest warrant. "Probable cause exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a

[person] of reasonable caution in the belief that an offense has been or is being committed." *State v. Johnson*, 682 So. 2d 385, 388 (Ala. 1996) (cleaned up). "Probable cause to arrest is measured against an objective standard and, if the standard is met, it is unnecessary that the officer subjectively believe that he has a basis for the arrest." *Cox v. State*, 489 So.2d 612 (Ala. Crim. App. 1985). "An officer need not have enough evidence or information to support a conviction in order to have probable cause for arrest. Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Johnson*, 682 So. 2d at 387-88 (cleaned up).

DiStefano and Keeton receive immunity for their conduct in securing an arrest warrant because the facts, construed in the light most favorable to Davis, portray the officers sustained probable cause Davis committed the crime of third-degree harassment. *See Ex parte* Harris, 216 So. 3d 1201, 1214 (Ala. 2016) ("Because Harris had arguable probable cause to arrest Bryson, we cannot say that he acted 'willfully, maliciously, fraudulently, [or] in bad faith' so as to remove him from the umbrella of State-agent immunity afforded him under *Ex parte Cranman*.") (citing *Ex parte Tuscaloosa Cty.,* 796 So.2d 1100 (Ala. 2000); *Borders v. City of Huntsville,* 875 So.2d 1168 (Ala.2003); *Wood v. Kesler,* 323 F.3d 872, 884 (11th Cir. 2003) ("The existence of probable cause, and in particular the facts showing that probable cause, contradict any suggestion of malicious intents or bad faith.")). In particular, reports elicited from Katie and Landon indicate Davis pushed Katie against the home's exterior wall and held her there by her throat. Moreover, Davis admitted attempting to restrain Katie. These facts would lead

a reasonable officer to believe Davis shoved or otherwise touched Katie to "create an unpleasant or hostile situation" (*Shepheard*, 2015 WL 3887332 at *5 (quotation marks and citation omitted)) or a "sudden sharp apprehension and fear resulting from the perception of imminent danger" (*Zgouvas*, 953 So.2d at 442) within the meaning of Alabama's harassment statute. The police reports also establish Katie constituted Davis's child within the meaning of the Alabama third-degree domestic violence statute. Additionally, the arrest warrant did not omit any material information or contain any material misstatements.

As delineated previously, the absence of probable cause also defeats Davis's malicious prosecution claim against Wesson, albeit on the merits. *See supra* n. 25. Accordingly, the court **DISMISSES** Count IV in full.

## C. The Court Dismisses Count VI Because Davis Cannot Prove an Underlying Unlawful Activity Occurred.

"Conspiracy is not an independent cause of action; therefore, when alleging conspiracy, a plaintiff must have a viable underlying cause of action." *Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So.2d 1280, 1290 (Ala. 1993); *see also O'Dell v. State ex rel. Patterson*, 270 Ala. 236, 240, 117 So.2d 164, 168 (1959) ("Where civil liability for a conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action. The gist of the action is not the conspiracy alleged but the wrong committed.").

Davis's conspiracy claim rests upon the underlying claims of false arrest and malicious prosecution. As discussed previously, such claims do not hold water under

either federal law or state law, because (1) a claim for false arrest hinges on the absence of legal process and (2) probable cause defeats a claim for malicious prosecution. As such, there can be no conspiracy to deprive Davis of constitutional rights, and the court **DISMISSES** Davis's state law conspiracy claim against all Defendants.

**CONCLUSION**

For the foregoing reasons, the court **GRANTS** Defendants' Motions for Summary Judgment (docs. 32, 36), **DENIES** Plaintiff's Motion for Summary Judgment (doc. 37), and **DISMISSES** all claims against Defendants **WITH PREJUDICE**.

**DONE** and **ORDERED** this 19th day of February, 2025.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE